IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,
          Plaintiff,

vs.                                                                   No. 20-CR-267 JP

ERIC BELDING,
          Defendant.

## DEFENDANT ERIC BELDING'S EMERGENCY MOTION
## FOR RELEASE PENDING SENTENCING

COMES NOW, Defendant Eric Belding, by and through his counsel of record, Erlinda O. Johnson, Esq., and hereby moves this Honorable Court pursuant to the provisions of 18 U.S.C. § 3145(c), the holding set forth in *United States v. Jones,* 979 F.2d 804, 806 (10th Cir. 1992) (district court may consider release pending sentencing for defendant who pleaded guilty to controlled substances offense carrying maximum penalty of 40 years under "exceptional reasons" provision of § 3145(c)) and *United States v. Ganadonegro*, No. 09-cr-0312-JB, 2012 WL 1132166, at 5 (March 14, 2012) (Browning, J.) (unreported) (holding *Jones* permits release for exceptional circumstances pursuant to § 3145(c) even in a case where 18 U.S.C. § 3143(a)(2) applies), and changed circumstances which rise to exceptional due to the COVID-19 pandemic that poses a direct risk to Eric Belding that is far greater if he continues to be detained during this public health crisis, for an order allowing Mr. Belding's release pending sentencing.

## BACKGROUND

Mr. Belding was arrested on April 15, 2019, pursuant to a complaint filed in the United States District Court for the District of New Mexico, charging possession with intent to distribute controlled substances. He has remained in custody since that date.

On January 27, 2020, Mr. Belding entered guilty pleas to two counts of possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and (C). On March 24, 2020, the presentence report (PSR) was issued by the U.S. Probation Office. According to the PSR, Mr. Belding's advisory guideline range is 108-135 months. However, the plea agreement pursuant to Fed.R.Crim.P. 11(c)(1)(C), calls for a sentencing cap of 120 months. Moreover, Mr. Belding represents that he should be awarded a two-level offense level reduction pursuant to U.S.S.G. § 5C1.2 for the safety valve provision as he is in criminal history category I.[1] The only issue to be resolved by the court with regard to the safety valve applicability will be whether a firearm possession would disqualify Mr. Belding from the safety valve.

Mr. Belding now asks the court to release him on conditions of release pending sentencing pursuant to 18 U.S.C. § 3145(c) because exceptional reasons now exist which militate in favor of his temporary release. Mr. Belding submits that conditions of release could be fashioned to ensure he is neither a flight risk nor a danger to the community. The only question is whether exceptional reasons exist to justify his release pending sentencing.

## ARGUMENT

**I.     The Court should authorize Mr. Belding's release pending sentencing pursuant to 18 U.S.C. § 3145(c) because he is not a flight risk nor a danger to the community and now exceptional reasons exist to release him.**

Following a plea of guilty, the provisions of 18 U.S.C. § 3143(a)(2) are triggered, permitting a court to, under 18 U.S.C. § 3145(c), order a defendant's release if a court finds that the defendant is not a danger to the community or a flight risk, and exist exceptional reasons exist to justify release. *United States v. Ganadonegro*, 2012 WL 1132166, at 3; *United States v.*

---

[1] Mr. Belding intends to file an objection to the PSR for probation's failure to award Mr. Belding a two-level reduction for safety valve pursuant to U.S.S.G. § 5C1.2.

2

*Peterson*, 185 F.3d 875, 1999 WL 407493, at *1 (10th Cir.1999) (unpublished table decision); *United States v. Kinslow*, 105 F.3d 555, 556–57 (10th Cir.1997)(stating that a defendant who sought release pending sentencing for a crime of violence must show by clear and convincing evidence that he was "not likely to flee or pose a danger to any other person or the community" and "making a clear showing of exceptional reasons why his detention would not be appropriate"); *United States v. Jager*, No. 10–1531, 2011 WL 831279, at * 18 (D.N.M. Feb. 17, 2011) ("Once a court finds that a defendant meets the criteria of § 3143(a)(2), a court may order a defendant's release if a court finds that the defendant is not a danger and there exists exceptional circumstances to justify release.").

In fact, in *United States v. Jones*, the defendant pleaded guilty to a controlled substances offense carrying maximum penalty of 40 years. 979 F.2d 804, 806 (10th Cir. 1992). The Tenth Circuit held a district court may consider release under § 3145(c) if exceptional reasons exist notwithstanding the provisions of 18 U.S.C. § 3143(a)(2). No clear formula exists to determine if exceptional reasons are present. "A wide range of factors may bear upon the analysis." *Ganadonegro*, 2012 WL 1132166, at 4 (*quoting United States v. Garcia*, 340 F .3d 1013, 1018 (9th Cir.2003)). The Tenth Circuit has stated that exceptional reasons means "being out of the ordinary: uncommon, rare." *Id.* (quoting *United States v. Wages*, 271 F.App'x 726, 727 (10th Cir.2008) (per curiam)(unpublished)).

By adopting the term "exceptional reasons," and nothing more, Congress placed broad discretion in the district court to consider all the particular circumstances of the case before it and draw upon its broad "experience with the mainsprings of human conduct." *Mozes v. Mozes,* 239 F.3d 1067, 1073 (9th Cir.2001). Indeed, courts across the country have used that discretion to allow release and find exceptional reasons. *United States v. Charger*, 918 F.Supp. 301, 303-04

(D.S.D.1996)(finding exceptional reasons where young first-time offender was in need of guidance available to him at his father's home and was participating in out-patient alcohol treatment, such that to imprison him "would be counterproductive .... [and] would harm defendant and the interests of society"); *United States v. Cantrell*, 888 F.Supp. 1055, 1057-58 (D.Nev.1995)(ordering release of Native American defendant who was subject to dual prosecution by federal and tribal courts and was participating in substance abuse program); *United States v. Salome,* 870 F.Supp. 648, 653-55 (W.D.Pa.1994); *Contra, United States v. Wages*, 271 F. App'x 726 (10th Cir. 2008)( Defendant's age, lack of prior criminal record, use of a wheelchair and need for a special mattress to avoid pain, limited ability to hear, and need to care for his elderly mother did not constitute exceptional reasons warranting release pending sentencing on conviction for possession of child pornography).

Mr. Belding submits that since entering his guilty plea exceptional circumstances have developed requiring his temporary release from custody. As of March 30, 2020, the new strain of coronavirus which causes COVID-19, has infected over 693,224 people, leading to at least 33,106 deaths worldwide.[2]  On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[3]  Governor Lujan-Grisham declared a State of Emergency on March 11, 2020,[4] and has ordered schools to close, restaurants and bars to operate at 50% capacity, prohibit bar seating, and space tables six feet apart.[5]  All of these are measures

---

[2] World Health Organization- *Coronavirus Disease 2019- Situation report 70,* March 30, 2020, *at* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200330-sitrep-70-covid-19.pdf?sfvrsn=7e0fe3f8_2 (updating regularly).

[3] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) *at* https://bit.ly/2W8dwpS.

[4] https://www.governor.state.nm.us/2020/03/11/updated-governor-department-of-health-announce-first-positive-covid-19-cases-in-new-mexico/

[5] https://www.kob.com/albuquerque-news/covid-19-state-issues-public-health-order-limiting-restaurant-bar-occupancy-to-no-more-than-50/5674949/

impossible to achieve within a detention facility. Mayor Tim Keller ordered precautionary measures in Albuquerque on March 14, 2020,[6] including closure of senior centers, community centers, and all bio park facilities, and ordering city workers to work from home, and following a city council vote on March 16 to grant him greater emergency powers, is expected to order further protective measures.[7] As of April 1, 2020, there are 363 positive cases in New Mexico and six deaths.[8]

The CDC has issued guidance that individuals at higher risk of contracting COVID-19—adults over 60 years old and people with chronic medical conditions such as lung disease and heart disease—take immediate preventative actions, including avoiding crowded areas and staying home as much as possible.[9] With confirmed cases in New Mexico that indicate community spread,[10] we must take every necessary action to protect vulnerable populations and the community at large.

> *Mr. Belding's Current Conditions of Confinement Place him at Great Risk for COVID-19*

Conditions of pretrial or presentence confinement create the ideal environment for the transmission of contagious disease.[11] Inmates cycle in and out of pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening. Incarcerated people have poorer health than the general population, and even at the

---

[6] https://www.cabq.gov/mayor/news/mayor-continues-local-response-to-coronavirus-as-first-presumptive-positives-are-found-in-new-mexico
[7] https://www.abqjournal.com/1430500/new-bill-would-give-abq-mayor-more-emergency-powers.html (March 11, 2020)
[8] https://nmhealth.org/news/alert/2020/4/?view=890
[9] *People at Risk for Serious Illness from COVID-19*, CDC (March 12, 2020) *at* https://bit.ly/2vgUt1P.
[10] The KOAT story supra n. 7 indicates that while the first 5 cases in Bernalillo County had travel-related exposure; the next 8 did not.
[11] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.

5

best of times, medical care is limited in pretrial detention centers.[12] Many people who are incarcerated also have chronic conditions, like diabetes, hepatitis, or HIV, which makes them vulnerable to severe forms of COVID-19. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[13] Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[14] In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases as of February.[15] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[16] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[17] Bernalillo County District Attorney Raúl Tórrez, joined by Chief Public Defender Ben Baur, has asked the Supreme Court to intervene and delay hearings for out of custody defendants.[18] In his letter to the Supreme Court, Chief Public Defender Baur

---

[12] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf

[13] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[14] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.

[15] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020) *at* https://bit.ly/2vSzSRT.

[16] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020) *at*   https://cnn.it/2W4OpV7.

[17] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020) *at* https://apnews.com/af98b0a38aaabedbcb059092db356697.

[18] Katy Barnitz, *DA to Supreme Court: 'More drastic measures are needed'; Chief Public Defender says virus could spread rapidly in jails* Albuquerque Journal, March 17, 2020, p. A5, available at:  https://abqjournal-nm.newsmemory.com/?token=6de4ac0363592ffd8224cfe06797f461_5e70fd08_2eb4cef&selDate=20200317&utm_source=emailMarketing&utm_medium=email&utm_campaign=TecnaviaMorningPush

noted, "Social distancing is the single most effective tool we have to slow the spread and flatten the curve to ensure that adequate healthcare resources are available as the numbers of infections increase. Unfortunately, incarcerated people do not have the ability to utilize social distancing techniques or to protect themselves in any meaningful manner." He called for a suspension of arrest and detention for non-violent offenses, failure to pay fines, technical violations of release or probation, and other violations which do not threaten public safety. On March 17, in response to these pleas and the pandemic, the New Mexico Supreme Court suspended all criminal jury trials, in addition to its previous suspension of civil trials.[19] On April 1, 2020, this Court suspended all civil and criminal jury trial until May 1, 2020.

***Specific Conditions at the Cibola Correctional Center***

The Cibola Correctional Center (CCC) is one of New Mexico's largest pretrial detention facilities housing pretrial and presentence detainees; it has a capacity of 1,149,[20] with a current "mission" encompassing immigration detainees, marshal detainees, and Cibola County detainees. It has had repeated medical issues. Between 2007 and 2016 before it was closed due to issues, it was given 30 citations for poor medical care, including the lack of an on-location doctor, failure to perform CPR, and lack of mental health evaluation for a suicidal inmate.[21] In 2016, it was closed. "[T]he US Department of Justice announced that all 13 of [its contracted] private prisons would be closed following a scathing audit that revealed they were markedly less safe than similar facilities run directly by the government. The first scheduled to close would be the one where Jaramillo suffered his catastrophic illness, as reports indicated that the Cibola County

---

[19] https://www.nmcourts.gov/news.aspx
[20] https://en.wikipedia.org/wiki/Cibola_County_Correctional_Center
[21] Wessler, Seth Freed ,*Federal Officials Ignored Years of Internal Warnings About Deaths at Private Prisons*, ISSN 0027-8378. (2016-06-15).

7

prison was among the worst providers of medical care in this cohort of private prisons."[22]  It reopened shortly thereafter as an ICE and county detention facility, then began accepting marshals prisoners.  Shortly after it reopened, there was the very high-profile death of a Honduran transgender refugee shortly after she arrived at CCC.[23]

### *Exceptional Circumstances Have Developed Necessitating Mr. Belding's Release*

The circumstances that existed when Eric Belding was ordered detained and subsequently entered his guilty plea have now changed.  There is a pandemic that poses a direct risk to Eric Belding that is far greater if he continues to be detained during this public health crisis. Eric Belding is vulnerable because he suffers from cardiomyopathy which is a disease of the heart muscle that makes it harder a person's heart to pump blood to the rest of his body. Cardiomyopathy can lead to heart failure. Mr. Belding was born with this heart defect which was initially diagnosed as a very large ventricular septal defect.

Since he has been in custody at the CCC, he has been seen by medical personnel and advised that tests show that his heart is enlarged as a result of reduced ventricular function. That means his heart is not pumping the necessary amount of blood into Mr. Belding's body. Essentially, his heart has enlarged as a result of having to work overtime in order to pump blood into Mr. Belding's system. According to the CDC, someone like Mr. Belding who suffers from cardiac disease is at higher risk of suffering from severe complications, even death, if he contracts COVID-19.[24]

---

[22] Oliver Laughlin, *Man's death hints at wretched medical care in private immigration prisons*, The Guardian (Nov. 1, 2016) available at:  https://www.theguardian.com/us-news/2016/nov/01/jose-jaramillo-private-immigration-prisons-medical-care
[23]  Sandra E. Garcia, *Independent Autopsy of Transgender Asylum Seeker Who Died in ICE Custody Shows Signs of Abuse*, New York Times, (Nov. 27, 2018) available at: https://www.nytimes.com/2018/11/27/us/trans-woman-roxsana-hernandez-ice-autopsy.html
[24] https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html

Since the widespread contagion of COVID-19, Courts have been taking steps to protect those defendants at high risk of complications or dying from the virus. In *United States v. Kennedy*, No. 5:18-cr-20315, Dkt. No. 77 (E.D. Mich. Mar. 27, 2020), the Court released a post-plea presentence defendant noting "the COVID-19 pandemic constitutes an independent compelling reason" for temporary release and "is *necessary* for Defendant to prepare his pre-sentence defense". In *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020), the Court released the defendant with a criminal history in a gun and drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement".

Given the alarming rate of spread of COVID-19 and the demonstrated fact that individuals like Eric Belding could potentially die if contaminated by the virus, exceptional circumstances exist which militate in favor of temporarily releasing Mr. Belding to the third party custody of his father, Dana Belding. From Eric Belding's perspective, his life is on the line, creating a powerful incentive to abide by any release conditions the Court may impose and changing the calculus that initially led to the denial of bail in this case. While it is true that Mr. Belding was arrested several times with drugs and guns in a span of about 15 months, given his now compromised state of health and his sobriety for the past 12 months, the likelihood that he will violate conditions of his release have diminished.

Critically, during this temporary release, Eric Belding will not be left to his own devices, but will be supported and monitored by Pretrial Services. Since 2009, Pretrial Services' data has found that only 2.9% of defendants in the highest risk category were re-arrested for a violent

9

crime while on release.[25] In the District of New Mexico, the Pretrial Services Violations Summary Report for the 12-Month Period Ending September 30, 2018, of the 919 cases in release status, there were violations in only 14.6% of the cases, and only 33 failures to appear. There were zero rearrest violations (for new crimes).[26] The elderly and chronically ill, no matter what crime they are accused of, pose a lower risk of violating supervision, particularly during a global pandemic during which even leaving the house will endanger their lives. Eric Belding's father has confirmed with counsel that he is willing to act as Mr. Belding's third-party custodian, provide a safe place for Mr. Belding to reside in the family home with his parents. Eric Belding submits that release to the third-party custody of his father, electronic monitoring, home confinement and supervision by pretrial services represent conditions the court may impose to ensure Mr. Belding will not pose a danger to the community or flee.

The totality of circumstances in this case given Mr. Belding's serious heart disease and the wide and rapid spread of COVID-19 establish exceptional reasons to release him pending sentencing.

Moreover, the plea in this case may allow for the possibility of a sentence of time-served should the court find Mr. Belding should be awarded a two-level offense level reduction for the safety valve pursuant to U.S.S.G. § 5C1.2.[27] Leaving Mr. Belding in custody in the midst of the national health crisis we face today could expose him to the possible deprivation of life. The

---

[25] Thomas H. Cohen, Christopher T. Lowenkamp, and William E. Hicks, *Revalidating the Federal Pretrial Risk Assessment Instrument (PTRA): A Research Summary* (September 2018) *at* https://www.uscourts.gov/sites/default/files/82_2_3_0.pdf.

[26] Table H-15, U.S. District Courts -- Pretrial Services Violations Summary Report For the 12-Month Period Ending September 30, 2018, available at:  http://jnet.ao.dcn/court-services/probation-pretrial-services/caseload-tables/pretrial-services-h-tables-september-2018/pretrial-services-violations-summary-report

[27] While the presentence report issued by the U.S. Probation office did not award Mr. Belding a two-level offense level reduction for the safety valve, Mr. Belding intends to file an objection thereto. If this Court rules Mr. Belding qualifies for a two-level reduction pursuant to U.S.S.G. § 5C1.2, the Court may sentence Mr. Belding to a sentence without regard to the statutory minimum.

exceptional reasons are demonstrated here. Therefore, the only other component allowing release pending sentencing would be a finding by clear and convincing evidence that he is not likely to flee or pose a danger to any other person or the community. This burden is met by the fact that Mr. Belding's heart condition has deteriorated while in custody and now potentially faces a risk of death if exposed to COVID-19. If released under home confinement and electronic monitoring, the Court may be assured that Mr. Belding will not leave his parents' home as doing so would expose him to grave danger to his health. It cannot be meaningfully disputed that Mr. Belding is not a flight risk. He has never been known to flee from law enforcement and has been a lifelong resident of Albuquerque.

Counsel for the government oppose the relief requested herein.

Wherefore, for the foregoing reasons, Mr. Belding respectfully moves this Honorable Court for an order allowing release pending sentencing.

Respectfully submitted,

Electronically filed 4/2/20
Erlinda O. Johnson
Counsel for Eric Belding
620 Roma Ave. NW
Albuquerque, NM 87102

CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of April 2020, I filed the foregoing motion electronically through the CM/ECF system, which caused opposing counsel for the Government to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

Electronically filed 4/2/20
Erlinda O. Johnson
Counsel for Mr. Belding

11